**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

| | |
|---|---|
| LUIS TORRES,<br><br>       *Plaintiff,*<br><br>v.<br><br>BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; SANOFI US SERVICES INC.; CHATTEM, INC.; PFIZER, INC.; WALMART INC.; PERRIGO COMPANY; and PERRIGO RESEARCH & DEVELOPMENT COMPANY,<br><br>       *Defendants.* | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS....................................................................................................... i

INTRODUCTION ...............................................................................................................1

PARTIES .............................................................................................................................2

JURISDICTION AND VENUE ..........................................................................................4

FACTUAL ALLEGATIONS ..............................................................................................5

    I.    Brief History of Zantac and Ranitidine....................................................................5

    II.    Dangers of NDMA...................................................................................................8

    III.    How Ranitidine Transforms into NDMA Within the Body....................................13

            Figure 1 –Ranitidine Structure & Formation of NDMA ...................................13

            Figure 2 –Mechanism for Decomposition of Ranitidine in NDMA ..................14

            Table 1. Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol......16

            Table 2.  Valisure Biologically relevant tests for NDMA formation ................17

            Figure 3 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme...........19

            Figure 4 – Expression levels of DDAH-1 enzyme by Organ .............................20

    IV.    Defendants Knew of the NDMA Defect but Failed to Warn or Test .............................22

    V.    Plaintiff-Specific Allegations.................................................................................24

TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL .............................................25

CAUSES OF ACTION ......................................................................................................26

            COUNT I:  STRICT LIABILITY – DESIGN DEFECT .................................26

            COUNT II:  STRICT LIABILITY – FAILURE TO WARN ..........................31

            COUNT III:  NEGLIGENCE ..........................................................................35

            COUNT IV:  BREACH OF EXPRESS WARRANTIES .................................41

            COUNT V:  BREACH OF IMPLIED WARRANTIES ...................................45

            COUNT VI:  NEGLIGENT MISREPRESENTATION...................................47

JURY TRIAL DEMAND ..................................................................................................49

PRAYER FOR RELIEF ....................................................................................................49

# INTRODUCTION

1.      Ranitidine is an over-the-counter medication that is designed to decrease the amount of acid created by the stomach.  Ranitidine is the generic form of Zantac.  Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Sanofi US Services Inc., Chattem, Inc., and Pfizer, Inc. owned the rights to over-the-counter Zantac at different times during the fifteen (15) year period that Plaintiff, Luis Torres regularly ingested ranitidine.  Defendant Walmart Inc. sells ranitidine medication manufactured and distributed by Perrigo Company and Perrigo Research & Development Company (hereinafter collectively "Perrigo") under the brand name Equate Ranitidine Tables ("Equate").

2.      Equate is intended to be used for the treatment of heartburn associated with indigestion and sour stomach.  However, Perrigo's design and manufacturing process (based on the Zantac patent) has caused Equate medications to contain dangerously high levels of nitrosodimethylamine ("NDMA").  NDMA is not listed as an ingredient in ranitidine or Zantac products.

3.      During the time that Defendants manufactured and sold Zantac and its generic form ranitidine, the weight of scientific evidence (going back before Zantac even entered the market) showed that Zantac/ranitidine exposed users to unsafe levels of NDMA.   The Defendants failed to disclose this risk to consumers on the drug's label or through any other means, and failed to report these risks to the FDA.  Defendants concealed the Zantac/ranitidine-NDMA link from consumers by not reporting it to the FDA, which relies on drug manufacturers to bring information about an approved drug like Zantac/ranitidine to the agency's attention.

4.      Plaintiff, Luis Torres took Equate Ranitidine Tables for about 15 years and, as a result, developed bladder cancer. His cancer was caused by NDMA exposure created by the

1

ingestion of Equate. This lawsuit seeks damages against Boehringer Ingelheim Pharmaceuticals, Inc., Sanofi US Services Inc., Chattem, Inc., Pfizer, Inc., Walmart Inc., Perrigo Company and Perrigo Research & Development Company (hereinafter collectively referred to as "Defendants") for causing his bladder cancer.

## PARTIES

5.      Plaintiff Luis Torres (hereinafter "Plaintiff"), is a citizen of Marion County, Florida.

6.      Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BI") is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.  BI maintains a registered agent in Florida at CT Corporation, 1200 South Pine Island Road, Plantation, Florida 33324.   BI is a subsidiary of the German company Boehringer Ingelheim Corporation. BI owned the U.S. rights to over-the-counter ("OTC") Zantac between December 2006 and January 2017, and manufactured and distributed the drug in the United States during that period.

7.      Defendant Sanofi US Services Inc., ("Sanofi") is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of Sanofi S.A.  Sanofi maintains a registered agent in Florida at Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.  Sanofi controlled the New Drug Application ("NDA") for OTC Zantac starting in January 2017 through the present.

8.      Defendant Chattem, Inc. ("Chattem") is a Tennessee corporation with its principal place of business located at 1715 West 38th Street Chattanooga, Tennessee 37409.  Service should be made on Chattem at CSC, 2908 Poston Avenue, Nashville, Tennessee 37203.  Chattem

is a wholly owned subsidiary of Sanofi S.A., a French multinational corporation.  Chattem distributes OTC Zantac for Sanofi.

9.      Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017.  Pfizer maintains a registered agent in Florida at CT Corporation, 1200 South Pine Island Road, Plantation, Florida 33324.  Pfizer was the original NDA holder for OTC Zantac, and controlled the NDA between August 2004 and December 2006.

10.      Defendant Walmart Inc. ("Walmart") is a Delaware corporation with its principal place of business located at 708 SW 8th Street, Bentonville, Arkansas 72716.  Walmart maintains a registered agent at CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

11.      Defendant Perrigo Company is a Michigan corporation with its North American Base of Operations located at 515 Eastern Avenue, Allegan, Michigan 49010.  Perrigo Company's registered agent is Richard Hansen, located at 117 Water Street, Allegan, Michigan 49010.  Perrigo Company's parent company, Perrigo Company PLC is a corporation registered in Ireland, and maintains a headquarters in Dublin, Ireland.  The Perrigo Company PLC is registered in Ireland for tax purposes.  Perrigo Company conducts substantial business in the United States, and the vast majority of its sales are in the United States. Perrigo Company does substantial business in the State of Florida. Perrigo Company has been engaged in the manufacturing, distribution, and sale of defective ranitidine throughout the United States, including in the State of Florida.

12.      Defendant Perrigo Research & Development Company is a corporation organized under the laws of Michigan with a principal place of business at 601 Abbot Road, East Lansing,

Michigan 48823. Perrigo Research & Development Company is the holder of Abbreviated New Drug Application ("ANDA") 091429, which is the ranitidine used in Equate.

13.     Upon information and belief, Defendant Perrigo Research & Development Company is a wholly owned subsidiary of Perrigo Company. There exists, and at all times herein existed, a unity of ownership between Perrigo Company, Perrigo Research & Development Company, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the other. Upon information and belief, Perrigo Company communicates with Perrigo Research & Development Company concerning virtually all aspects of the ranitidine-containing medications it distributes in the United States. At all relevant times, Perrigo Research & Development Company acted as an authorized agent, representative, servant, employee and/or alter ego of Perrigo Company while performing activities including but not limited to advertising, warranties, dissemination of information, and distribution of ranitidine-containing medications in the United States and in the State of Florida.

14.     Walmart sells ranitidine medication manufactured and distributed by Perrigo under the brand name Equate.  Plaintiff purchased his Equate medication from a Walmart store in this District.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over each Defendant insofar as each Defendants is authorized and licensed to conduct business in the State of Florida, maintains and

carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

17.     Additionally, the Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

18.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

19.     A transfer order, pertaining to Zantac (Ranitidine) related actions, has been issued by the United States Judicial Panel on Multidistrict Litigation.  *In re: Zantac (Ranitidine) Products Liability Litigation*, MDL No. 2924.  The Order transfers related/tag along actions pending outside the Southern District of Florida to the Southern District of Florida for coordination or consolidated pretrial proceedings.

## FACTUAL ALLEGATIONS

### I.     Brief History of Zantac and Ranitidine

20.     Zantac was developed by GlaxoSmithKline ("GSK") and approved for prescription use by the FDA in 1983. The drug belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.

21.     Due in large part to GSK's marketing strategy, Zantac was a wildly successful drug, reaching $1 billion in total sales in December 1986. As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . .enabled the product to dominate the acid/peptic marketplace."[1] Significantly, the marketing strategy that led to Zantac's success emphasized the purported safety of the drug.

22.     Zantac became available without a prescription in 1996, and generic versions of the drug (ranitidine) became available the following year. Although sales of brand-name Zantac declined as a result of generic and alternative products, Zantac sales have remained strong over time.  As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

23.     Over the past 20 years, the rights to Zantac in the U.S. have changed hands several times.

24.     As relevant here, in 1997, GSK's patent on Zantac expired and generic ranitidine entered the market.  Between 1998-2006, Pfizer retained the right to sell over-the-counter Zantac in the United States, and maintained ownership over the Zantac trademark.   Defendant Boehringer acquired the U.S. rights to over-the-counter Zantac in late 2006,[2] and manufactured and sold the drug in the United States—including in Florida—from approximately January 2007 to January 2017.[3]

---

[1] Wright, R., *How Zantac Became the Best-Selling Drug in History*, 1 J. HEALTHCARE MARKETING 4, 24 (Winter 1996).
[2] *Boehringer Ingelheim Pharmaceuticals, Inc. Announces Agreement to Acquire Zantac® from Johnson & Johnson and the Pfizer Consumer Healthcare Business*, BUSINESS WIRE (Oct. 12, 2006).
[3] *See Digesting an acquisition: Patrick Hennig, Boehringer Ingelheim; Ingelheim Pharmaceuticals to acquire U.S. rights for Zantac product line; Interview*, DRUG STORE NEWS (Mar. 5, 2007); Mike Pare, *Chattem adds Zantac, Dulcolax to portfolio*, CHATTANOOGA TIMES FREE PRESS (TENNESSEE) (Feb. 8, 2017).

25.     Sanofi acquired the U.S. rights to over-the-counter Zantac in approximately January 2017 and has since that time been manufacturing and selling the drug in the United States, including in Florida.

26.     The Food and Drug Administration (FDA) states that NDMA exposure above 96 nanograms a day is unsafe.  And yet, findings by an independent FDA-accredited laboratory, Valisure, Inc., show that in a single 150 mg dose of Zantac (ranitidine), consumers can be exposed to millions of nanograms of NDMA.

27.     On September 13, 2019, in response to a citizen's petition filed by Valisure, Inc. (discussed in detail below), U.S. and European regulators stated that they are reviewing the safety of ranitidine.

28.     On September 18, 2019, Novartis AG's Sandoz Unit, which makes generic drugs, stated that it was halting the distribution of its versions of Zantac in all markets, while Canada requested drug makers selling ranitidine to stop distribution.

29.     On September 28, 2019, CVS Health Corp. stated that it would stop selling Zantac and its own generic ranitidine products out of concern that it might contain a carcinogen.

30.     On October 2, 2019, the FDA stated that it was ordering all manufacturers of Zantac and ranitidine products to conduct testing for NDMA and that preliminary results indicated unacceptable levels of NDMA so far.

31.     Following, the FDA's announcement, on October 2, 2019, Walmart suspended the sale of all over the counter ranitidine products in its stores, clubs and online, including Zantac, Equate and Member's Mark brands.

32.     On October 8, 2019, Perrigo "halted shipments of [ranitidine] based upon preliminary test results."

33.     On October 23, 2019, Perrigo issued a voluntary recall of all of its ranitidine medications due to the "possible presence of a nitrosamine impurity called N-nitrosodimethylamine (NDMA)."[4]  Perrigo explained that "[b]ased on the totality of the data gathered to date, Perrigo has made the decision to conduct [a] voluntary recall."[5]

34.     At no time did any Defendant attempt to include a warning about NDMA or any cancer, nor did the FDA ever reject such a warning.  Defendants had the ability to unilaterally add an NDMA and/or cancer warning to the Zantac and ranitidine labels (for both prescription and OTC) without prior FDA approval pursuant to the Changes Being Effected regulation. Had any Defendant attempted to add an NDMA warning to the Zantac or ranitidine label (either for prescription or OTC), the FDA would not have rejected it.

## II.     Dangers of NDMA

35.     NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes.  It is a member of N-nitrosamines, a family of potent carcinogens. The dangers that NDMA poses to human health have long been recognized. A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[6]  NDMA

---

[4] Food & Drug Admin., Perrigo Company PLC Issues Voluntary Worldwide Recall of Ranitidine Due to Possible Presence of Impurity, N-nitrosodimenthylamine (NDMA) Impurity in the Product (Oct. 23, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/perrigo-company-plc-issues-voluntary-worldwide-recall-ranitidine-due-possible-presence-impurity-n (last visited March 5, 2020).

[5] Id.

[6] Jane Brody, Bottoms Up: Alcohol in moderation can extend life, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); see Rudy Platiel, Anger grows as officials unable to trace poison in reserve's water, THE GLOBE AND MAIL CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, DNA adducts in humans after exposure to methylating agents, 405 MUTAT. RESEAR. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including

is no longer produced or commercially used in the United States, except for research, such as a tumor initiator in certain animal bioassays. In other words, it is only a poison.

36.     Both the Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen. And the World Health Organization ("WHO") has stated that scientific testing indicates that NDMA consumption is positively associated with either gastric or colorectal cancer and suggests that humans may be especially sensitive to the carcinogenicity of NDMA.

37.     As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

38.     Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.  The FDA has established a permissible daily intake limit for the probable human carcinogen, NDMA, of 96 ng (nanogram).  However, the highest level of NDMA detected by the FDA in any of the Valsartan tablets was 20.19 µg (or 20,190 ng) per tablet.  In the case of Valsartan, the NDMA was an impurity caused by a manufacturing defect, and thus NDMA was present in only some products containing valsartan.  Zantac/ranitidine poses a greater safety risk than any of the recently recalled valsartan tablets. Not only is NDMA a byproduct of the ranitidine molecule, itself, but the levels observed in recent testing show NDMA levels in excess of 3,000,000 ng.

---

tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

39.     Tobacco smoke also contains NDMA. One filtered cigarette contains between 5 – 43 ng of NDMA.

40.     In mouse studies examining the carcinogenicity of NDMA through oral administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung. In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and lung. In comparable hamster studies, similar cancers were observed in the liver, pancreas, and stomach. In comparable Guinea-pig studies, similar cancers were observed in the liver and lung. In comparable rabbit studies, similar cancers were observed in the liver and lung.

41.     In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

42.     Alarmingly, Zantac/ranitidine is in the FDA's category B for birth defects, meaning it is considered safe to take during pregnancy.  However, in animal experiments, for those animals exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and kidneys.

43.     In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer.  In animal studies, derivatives of NDMA induced cancer in the stomach and intestine (including colon).

44.     Research shows that lower levels of NDMA, i.e., 40 ng, are fully metabolized in the liver, but high does enter the body's general circulation.

45.     Numerous in vitro studies confirm that NDMA is a mutagen—causing mutations in human and animal cells.

46.     Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested: mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, fish, newts, and frogs.

47.     Pursuant to the EPA" cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."

48.     In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.  And, while these studies (several discussed below) consistently show increased risks of various cancers, the exposure levels considered in these studies are a very small fraction—as little as 1 millionth—the exposures noted in a single Zantac capsule, i.e., 0.191 ng/day (dietary) v. 304,500 ng/day (Zantac).

49.     In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 ng/day.[7]

50.     In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 ng/day.[8]

51.     In another 1995 epidemiological case-control study looking at, in part, the effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at .179 ng/day.[9]

---

[7] Pobel et al, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France*, 11 EUROP. J. EPIDEMIOL. 67–73 (1995).
[8] La Vecchia et al, *Nitrosamine intake and gastric cancer risk*, 4 EUROP. J. CANCER. PREV. 469– 474 (1995).

52.     In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "N-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[10]

53.     In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[11]

54.     In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[12]

55.     In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[13]

---

[9] Rogers et al, *Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cancer*, 5 CANCER EPIDEMIOL. BIOMARKERS PREV. 29–36 (1995).

[10] Knekt et al., *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 INT. J. CANCER 852–856 (1999).

[11] Straif et al., *Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers*, 57 OCCUP ENVIRON MED 180–187 (2000).

[12] Loh et al., *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM J CLIN NUTR. 1053–61 (2011).

[13] Zhu et al, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 BR J NUTR. 6, 1109–1117 (2014).

### III.    How Ranitidine Transforms into NDMA Within the Body

56.    The high levels of NDMA produced by Zantac and ranitidine are not caused by a manufacturing defect but are inherent to the molecular structure of ranitidine, the active ingredient in Zantac and its generic form ranitidine. The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form NDMA. See Fig. 1. Thus, ranitidine produces NDMA by "react[ing] with itself", which means that every dosage and form of ranitidine, including Zantac and its generic form ranitidine, exposes users to NDMA.

**Figure 1 –Ranitidine Structure & Formation of NDMA**



57.     The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the American water supply.[14]  Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater treatment plants was specifically linked to the presence of ranitidine.[15]

**Figure 2 –Mechanism for Decomposition of Ranitidine in NDMA**



58.     The high instability of the ranitidine molecule was further elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed, as shown in Figure 2 above.[16]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

---

[14]  Ogawa et al., *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. BIO. CHEM. 17, 10205-10209 (1989).
[15]  Mitch et al, *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 ENV. ENG. SCI. 5, 389-404 (2003).
[16]  Le Roux et al, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism, 46 Environ. Sci. Technol*. 20, 11095-11103 (2012).

59.     These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule. Recent testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

60.     Valisure, LLC is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO") – an accreditation recognizing the laboratories technical competence for regulatory. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

61.     As part of its testing of Zantac and other ranitidine products, in every lot tested, Valisure discovered exceedingly high levels of NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels. As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[17]   The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Ranitidine, Equate tablet, shown below in Table 1.

---

[17] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S*.

| Table 1.  Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
| --- | --- | --- |
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| **Ranitidine, Equate** | **9BE2772** | **2,479,872** |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

62.     Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at 28,000 times the legal limit. In terms of smoking, a person would need to smoke at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of Zantac.

63.     Valisure, however, was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol. So, Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

64.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.

65.   Indeed, Zantac/ranitidine was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, etc.[18]

66.   The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2.  Valisure Biologically relevant tests for NDMA formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

67.   Under biologically relevant conditions, when nitrites are present, staggeringly high levels of NDMA are found in one dose of 150 mg Zantac/ranitidine, ranging between 245 and 3,100 times above the FDA-allowable limit.  In terms of smoking, one would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac/ranitidine at the 25 ng level (over 7,000 for the 50 μg level).

68.   Antacid drugs are known to increase stomach pH and thereby increase the growth of nitrite-reducing bacteria which further elevate levels of nitrite. This fact is well known and even present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically studied with ranitidine in the original approval of the drug.  Thus, higher levels of nitrites in patients regularly taking Zantac/ranitidine would be expected.

---

[18] See, e.g., https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUlEg; https://youtu.be/qvh9gyWqQns.

69.     In fact, NDMA formation in the stomach has been a concern for many years and specifically ranitidine has been implicated as a cause of NDMA formation by multiple research groups, including those at Stanford University.

70.     Existing research shows that ranitidine interacts with nitrites and acids in the chemical environment of the human stomach to form NDMA. In vitro tests demonstrate that when ranitidine undergoes "nitrosation" (the process of a compound being converted into nitroso derivatives) by interacting with gastric fluids in the human stomach, the by-product created is dimethylamine ("DMA") – which is an amine present in ranitidine itself.  When DMA is released, it can be nitrosated even further to form NDMA, a secondary N-nitrosamine.

71.     Moreover, in addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH") which can occur in other tissues and organs separate from the stomach.

72.     Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder. The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[19]

---

[19]  Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. BIO. CHEM. 17, 10205-10209 (1989).

73.     In Figure 3, below, computational modelling demonstrates that ranitidine (shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA," shown in blue).

**Figure 3 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**



74.     These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

75.     Figure 4 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.

**Figure 4 – Expression levels of DDAH-1 enzyme by Organ**



76.     DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate. This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs, including the bladder.

77.     In addition to the aforementioned *in vitro* studies that suggest a strong connection between ranitidine and NDMA formation, *in vivo* clinical studies in living animals add further weight to concern over this action and overall potential carcinogenicity. A study published in the journal *Carcinogenesis* in 1983 titled "Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite" specifically suspected the carcinogenic nature of ranitidine in combination with nitrite. The authors of this study concluded: "Our experimental findings have shown that simultaneous oral administration in rats of high doses of ranitidine and NaNO2 [nitrite] can produce DNA fragmentation either in liver or in gastric mucosa."[20]

---

[20] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite*, 4 CARCINOGENESIS 10, 1281-1285 (1983).

78.     The human data, although limited at this point, is even more concerning. A study completed and published in 2016 by Stanford University observed that healthy individuals, both male and female, who ingested Zantac 150 mg tablets produced roughly 400 times elevated amounts of NDMA in their urine (over 47,000 ng) in the proceeding 24 hours after ingestion.[21]

79.     Likely due to the perceived high safety profile of ranitidine, very few epidemiological studies have been conducted on this drug.

80.     A 2004 study published by the National Cancer Institute investigated 414 cases of peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[22] One of the variables investigated by the authors was the patients' consumption of a prescription antacid, either Tagamet (cimetidine) or Zantac (ranitidine). The authors concluded that "[r]ecent use of ulcer treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer, and this association was independent of the elevated risk observed with gastric ulcers." Specifically, the authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to bladder cancer risk." NDMA is among the most common of the N-Nitrosamines.

81.     A 1982 clinical study in rats compared ranitidine and cimetidine exposure in combination with nitrite. When investigating DNA fragmentation in the rats' livers, no effect was observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a significant DNA fragmentation.[23]

---

[21] Zeng et al, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016).

[22] Michaud et al, *Peptic ulcer disease and the risk of bladder cancer in a prospective study of male health professionals*, 13 CANCER EPIDEMIOL BIOMARKERS PREV. 2, 250-254 (2004).

[23] Brambilla et al., *Genotoxic Effects of Drugs: Experimental Findings Concerning Some Chemical Families of Therapeutic Relevance*, Nicolini C. (eds) Chemical Carcinogenesis. NATO

82.    Investigators at Memorial Sloan Kettering Cancer Center are actively studying ranitidine to evaluate the extent of the public health implications of these findings. Regarding ranitidine, one of the investigators commented: "A potential link between NDMA and ranitidine is concerning, particularly considering the widespread use of this medication. Given the known carcinogenic potential of NDMA, this finding may have significant public health implications[.]"

## IV.    Defendants Knew of the NDMA Defect but Failed to Warn or Test

83.    During the time that Defendants manufactured and sold Zantac/ranitidine in the United States, the weight of scientific evidence showed that Zantac/ranitidine exposed users to unsafe levels of NDMA. Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these risks to the FDA.

84.    Going back as far as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.  This was known or should have been known by Defendants.

85.    Defendants concealed the Zantac/ranitidine–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

86.    Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief

---

Advanced Study Institutes Series (Series A: Life Sciences), Vol 52. Springer, Boston, MA (1982).

description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

87.     "The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product." 21 C.F.R. § 314.81(b)(2)(v).

88.     Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac or ranitidine.

89.     Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

90.     In a 1981 study published by GSK, the originator of the ranitidine molecule, the metabolites of ranitidine in urine were studied using liquid chromatography.[24] Many metabolites were listed, though there is no indication that NDMA was looked for. Plaintiffs believe this was intentional—a gambit by the manufacturer to avoid detecting a carcinogen in their product.

91.     By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously), GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[25] This study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one). However, the study was rigged to fail. It used an analytical system called a

---

[24] Carey et al, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. & APPL. 1, 161-168 (1981).
[25] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 GUT. Vol. 28, 726-738 (1987).

"nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines. Furthermore, in addition to this approach being less accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." So, without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed. Again, this spurious test was intentional and designed to mask any potential cancer risk.

92.     There are multiple alternatives to Zantac that do not pose the same risk, such as Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium), and Lansoprazole (Prevacid).

### V.     Plaintiff-Specific Allegations

93.     Plaintiff used over-the-counter Walmart brand Equate (ranitidine) for fifteen (15) years from 2004 until it was recalled in October 2019.  He took it almost daily and carried it in his lunchbox with him to work.

94.     In May 2017, Plaintiff was diagnosed with bladder cancer.

95.     Based on prevailing scientific evidence, exposure to ranitidine (and the attendant NDMA) can cause bladder in humans.

96.     Plaintiff's bladder cancer was caused by ingestion of Equate ranitidine.

97.     Had any Defendant warned Plaintiff that Zantac could lead to exposure to NDMA or, in turn, cancer, Plaintiff would not have taken Equate ranitidine.

98.     Plaintiff did not learn of the link between his cancer and ranitidine exposure until after October 1, 2019, when he learned that Zantac and the generic form ranitidine contained high levels of NDMA.

## TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL

99.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to Zantac and its generic form ranitidine is injurious to human health.

100.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of Zantac and its generic form ranitidine, nor would a reasonable and diligent investigation by Plaintiff have disclosed that Zantac and its generic form ranitidine would cause Plaintiff's illnesses.

101.    The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' misrepresentations and concealment. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of Zantac and its generic form, ranitidine.

102.    As a result of Defendants' actions, Plaintiff could not reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

103.    Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Zantac and its generic form, ranitidine. Defendants had a duty to disclose the true character, quality and nature of Zantac and ranitidine because this was non-public information over which Defendants continue to have control. Defendants knew that this information was not available to Plaintiff, Plaintiff's medical providers and/or health facilities, yet Defendants failed to disclose the information to the public, including Plaintiff.

104.    Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## CAUSES OF ACTION

### COUNT I:  STRICT LIABILITY – DESIGN DEFECT

105.    Plaintiff incorporates paragraphs 1-104 as if fully stated herein.

106.    Plaintiff brings this strict liability claim against Defendants for defective design.

107.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac and ranitidine products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac and ranitidine products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the ranitidine product used by Plaintiff, as described herein.

108.    At all relevant times, Defendants' Zantac and ranitidine products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Plaintiff.

109.    At all relevant times, Defendants' Zantac and ranitidine products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Plaintiff, without

substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac and ranitidine products within this judicial district and aimed at a consumer market within this judicial district.  Defendants were at all relevant times involved in the retail and promotion of Zantac and ranitidine products marketed and sold in this judicial district.

110.    Defendants' Zantac and ranitidine products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

111.    Defendants' Zantac and ranitidine products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

112.    At all relevant times, Defendants knew or had reason to know that Zantac and ranitidine products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

113.    Therefore, at all relevant times, Defendants' Zantac and ranitidine products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a.  When placed in the stream of commerce, Defendants' Zantac and ranitidine products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.  When placed in the stream of commerce, Defendants' Zantac and ranitidine products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.  When placed in the stream of commerce, Defendants' Zantac and ranitidine products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.  Defendants did not sufficiently test, investigate, or study its Zantac and ranitidine products and, specifically, the ability for Zantac and ranitidine to transform into the carcinogenic compound NDMA within the human body;

e.  Exposure to Zantac and ranitidine products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug;

f.  Defendants knew or should have known at the time of marketing Zantac and ranitidine products that exposure to Zantac could result in cancer and other severe illnesses and injuries;

g.  Defendants did not conduct adequate post-marketing surveillance of its Zantac and ranitidine products; and

h.  Defendants could have employed safer alternative designs and formulations.

114.  Plaintiff used and was exposed to ranitidine without knowledge of its dangerous characteristics.

115.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of ranitidine in an intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

116.    Plaintiff could not reasonably have discovered the defects and risks associated with Zantac and ranitidine products before or at the time of exposure due to the Defendants' suppression or obfuscation of scientific information linking Zantac and ranitidine to cancer.

117.    The harm caused by Defendants' Zantac and ranitidine products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Zantac and ranitidine products were and are more dangerous than alternative products, and Defendants could have designed Zantac and ranitidine products to make them less dangerous.  Indeed, at the time Defendants designed Zantac and ranitidine products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

118.    At the time Zantac and ranitidine products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Zantac and ranitidine products. For example, the Defendants could have added ascorbic acid (Vitamin C) to each dose of Zantac and ranitidine, which is known to scavenge nitrites and reduce the ability of the body to recombine ranitidine into NDMA.[26]

---

[26] *See, e.g.*, Vermeer, et al., *Effect of ascorbic acid and green tea on endogenous formation of N nitrosodimethylamine and N-nitrosopiperidine in humans*. 428 MUTAT. RES., FUNDAM. MOL. MECH. MUTAGEN. 353–361 (1999); Garland et al., *Urinary excretion of nitrosodimethylamine and nitrosoproline in humans: Interindividual and intraindividual differences and the effect of administered ascorbic acid and a-tocopherol*, 46 CANCER RESEARCH 5392–5400 (1986).

119.    Defendants' defective design of Zantac and ranitidine products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Zantac and ranitidine products, including Plaintiff.

120.    Therefore, as a result of the unreasonably dangerous condition of their Zantac and ranitidine products, Defendants are strictly liable to Plaintiff.

121.    The defects in Defendants' Zantac and ranitidine products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained injuries.

122.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Zantac and ranitidine products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.

123.    As a direct and proximate result of Defendants placing its defective Zantac and ranitidine products into the stream of commerce, and the resulting injuries, Plaintiff sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

124.    As a proximate result of Defendants placing its defective Zantac and ranitidine products into the stream of commerce, as alleged herein, there is and was a measurable and significant interval of time during which Plaintiff has suffered great mental anguish and other personal injury and damages.

125.    As a proximate result of the Defendants placing its defective Zantac and ranitidine products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income and/or loss of earning capacity.

126.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II: STRICT LIABILITY – FAILURE TO WARN

127.    Plaintiff incorporates paragraphs 1-104 as if fully stated herein.

128.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

129.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac and ranitidine products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Zantac and ranitidine and NDMA.  These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Zantac and ranitidine and other ranitidine formulations within this judicial district and aimed at a consumer market. Defendants were at all relevant times involved in the retail and promotion of Zantac and ranitidine products marketed and sold in in this judicial district.

130.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Zantac and ranitidine products, and in the course of same, directly advertised or

marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Zantac and ranitidine products.

131.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Zantac and ranitidine products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of dangers associated with Zantac and ranitidine. Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

132.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Zantac and ranitidine products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

133.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' Zantac and ranitidine products, including Plaintiff.

134.    Even though Defendants knew or should have known that Zantac and ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Zantac and ranitidine, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time

they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiff.

135.    Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Zantac and ranitidine and the potential for ingested Zantac and ranitidine to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of Zantac and its generic form ranitidine.

136.    At all relevant times, Defendants' Zantac and ranitidine products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

137.    Plaintiff was exposed to ranitidine without knowledge of its dangerous characteristics.

138.    At all relevant times, Plaintiff used and/or was exposed to ranitidine while using it for its intended or reasonably foreseeable purposes, without knowledge of its dangerous characteristics.

139.    Plaintiff could not have reasonably discovered the defects and risks associated with Zantac and ranitidine products prior to or at the time of Plaintiff consuming ranitidine. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

140.    Defendants knew or should have known that the minimal warnings disseminated with their Zantac and ranitidine products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

141.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Zantac and ranitidine; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Zantac and ranitidine.

142.    This alleged failure to warn is not limited to the information contained on Zantac and generic ranitidine's labeling. The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Zantac and ranitidine through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

143.    Defendants are liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information

34

and data regarding the appropriate use of their products and the risks associated with the use of Zantac and ranitidine.

144.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Zantac and ranitidine products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative medication.

145.    As a direct and proximate result of Defendants placing defective Zantac and ranitidine products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

146.    As a proximate result of Defendants placing defective Zantac and ranitidine products into the stream of commerce, as alleged herein, there is and was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

147.    As a proximate result of Defendants placing defective Zantac and ranitidine products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income and/or loss of earning capacity.

148.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

149.    Plaintiff incorporates paragraphs 1-104 as if fully stated herein.

150.     Defendants, directly or indirectly, caused Zantac and ranitidine products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.   At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac and ranitidine within this judicial district and aimed at a consumer market within this district.

151.     At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Zantac and ranitidine products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

152.     At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Zantac and ranitidine products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Zantac and ranitidine and appropriate, complete, and accurate warnings concerning the potential adverse effects of Zantac and ranitidine and, in particular, its ability to transform into the carcinogenic compound NDMA.

153.     At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Zantac and ranitidine and, specifically, the carcinogenic properties of NDMA when Zantac is ingested.

154.     Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of ranitidine products could cause or be associated with Plaintiff's injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

155.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Zantac and its generic form ranitidine were unaware of the risks and the magnitude of the risks associated with use of Zantac and ranitidine.

156.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Zantac and ranitidine products, in that Defendants manufactured and produced defective Zantac and ranitidine which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.  Indeed, Defendants deliberately refused to test Zantac and ranitidine products because they knew that the chemical posed serious health risks to humans.

157.    Defendants were negligent in their promotion of Zantac and ranitidine, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Zantac and ranitidine, including the internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Zantac and ranitidine in their promotional efforts, outside of the context of labeling.

158.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants failed to do so.   Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of Zantac and ranitidine.

159.    Defendants' negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac and ranitidine products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac and ranitidine while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of Zantac and ranitidine and the carcinogenic potential of NDMA as created in the human body as a result of ingesting Zantac and ranitidine, and, consequently, the risk of serious harm associated with human use of Zantac and ranitidine;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Zantac and ranitidine products were safe for their intended consumer use;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Zantac and ranitidine products so as to avoid the risk of serious harm associated with the prevalent use of Zantac products;

e.  Failing to design and manufacture Zantac and ranitidine products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use Zantac and ranitidine products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of Zantac and ranitidine presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Zantac and ranitidine products;

j.  Representing that their Zantac and ranitidine products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Zantac and ranitidine products' labeling or other promotional materials that would alert consumers and the general public of the risks of Zantac and ranitidine;

l.  Advertising, marketing, and recommending the use of the Zantac and ranitidine products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Zantac and ranitidine;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Zantac and ranitidine products are not unsafe for regular consumer use; and

n.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

160.    Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Zantac and ranitidine.

161.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Zantac and ranitidine.

162.    Defendants' negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendants' negligence, Plaintiff would not have developed cancer.

163.    Defendants' conduct, as described above, was reckless.  Defendants regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.

164.    As a direct and proximate result of Defendants placing defective Zantac and ranitidine products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

165.    As a proximate result of Defendants placing defective Zantac and ranitidine products into the stream of commerce, as alleged herein, there is and was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

166.    As a proximate result of Defendants placing defective Zantac and ranitidine products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, and loss of earning capacity.

167.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT IV:  BREACH OF EXPRESS WARRANTIES

168.    Plaintiff incorporates paragraphs 1-104 as if fully stated herein.

169.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac and ranitidine products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac and ranitidine products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

170.    Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Zantac and ranitidine products, including a duty to:

   a.  ensure that its products did not cause the user unreasonably dangerous side effects;

   b.  warn of dangerous and potentially fatal side effects; and

   c.  disclose adverse material facts, such as the true risks associated with the use of and exposure to Zantac and ranitidine, when making representations to consumers and the general public, including Plaintiff.

171.    As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with Zantac and ranitidine is not limited to representations made on the labeling.

172.    At all relevant times, Defendants expressly represented and warranted to the purchasers of its products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Zantac and ranitidine products were safe to human health and the environment, effective, fit, and proper for their intended use.  Defendants advertised, labeled, marketed, and promoted Zantac and ranitidine products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Zantac and ranitidine products would conform to the representations.

173.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Zantac and ranitidine. Defendants knew and/or should have known that the risks expressly included in Zantac and ranitidine warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that Zantac and ranitidine products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff, and/or that they were safe and effective as consumer medication.

174.    The representations about Zantac and ranitidine, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

175.    Defendants placed Zantac and ranitidine products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of Zantac and ranitidine.

176.    Defendants breached these warranties because, among other things, Zantac and ranitidine products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

a.    Defendants represented through its labeling, advertising, and marketing materials that Zantac and ranitidine products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of Zantac and ranitidine and by expressly limiting the risks associated with use within its warnings and labels; and

b.    Defendants represented that Zantac and ranitidine products were safe for use and intentionally concealed information that demonstrated that Zantac and ranitidine, by transforming into NDMA upon human ingestion, had carcinogenic properties, and that Zantac and ranitidine products, therefore, were not safer than alternatives available on the market.

177.    Plaintiff detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of Zantac and ranitidine in deciding to purchase the product.  Plaintiff reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of Zantac and ranitidine. Plaintiff would not have purchased or used ranitidine had Defendants properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

178.    Defendants had sole access to material facts concerning the nature of the risks associated with its Zantac and ranitidine products, as expressly stated within their warnings and

labels, and knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Zantac and ranitidine warnings and labels were inadequate and inaccurate.

179.    Plaintiff had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Zantac or ranitidine.

180.    Plaintiff used and/or was exposed to ranitidine as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

181.    Had the warnings, labels, advertisements, or promotional material for Zantac and ranitidine products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

182.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

183.    As a proximate result of Defendants' breach of express warranty, as alleged herein, there is and was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

184.    As a proximate result of Defendants' breach of express warranty, as alleged herein, Plaintiff sustained a loss of income and/or loss of earning capacity.

185.     WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V: BREACH OF IMPLIED WARRANTIES

186.     Plaintiff incorporates paragraphs 1-104 as if fully stated herein.

187.     At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac and ranitidine products, which were and are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac and ranitidine products into the stream of commerce.

188.     Before the time Plaintiff used ranitidine, Defendants impliedly warranted to its consumers, including Plaintiff, that Zantac and ranitidine products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as consumer medication.

189.     But Defendants failed to disclose that Zantac and ranitidine has dangerous propensities when used as intended and that use of Zantac and ranitidine products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

190.     Plaintiff was an intended beneficiary of the implied warranties made by Defendants to purchasers of its Zantac and ranitidine products.

191.     The Zantac and ranitidine products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

192.     At all relevant times, Defendants were aware that consumers and users of its products, including Plaintiff, would use Zantac and ranitidine products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of ranitidine.

193.    Defendants intended that Zantac and ranitidine products be used in the manner in which Plaintiff, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though Zantac and ranitidine was not adequately tested or researched.

194.    In reliance upon Defendants' implied warranty, Plaintiff used ranitidine as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

195.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Zantac and ranitidine.

196.    Defendants breached their implied warranty to Plaintiff in that Zantac and ranitidine products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Zantac and ranitidine have dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

197.    The harm caused by Defendants' Zantac and ranitidine products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

198.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

199.    As a proximate result of the Defendants' breach of implied warranty, as alleged herein, there is and was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

200.    As a proximate result of Defendants' breach of implied warranty, as alleged herein, Plaintiff sustained a loss of income and/or loss of earning capacity.

201.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI: NEGLIGENT MISREPRESENTATION

202.    Plaintiff incorporates paragraphs 1-104 as if fully stated herein.

203.    Defendants negligently and/or recklessly misrepresented to Plaintiff, Plaintiff's prescribing physicians, and the healthcare industry the safety and effectiveness of Zantac and its generic form ranitidine and/or recklessly and/or negligently concealed material information, including adverse information, regarding the safety, effectiveness, and dangers posed by Zantac and ranitidine.

204.    Defendants made reckless or negligent misrepresentations and negligently and/or recklessly concealed adverse information when Defendants knew, or should have known, that Zantac and ranitidine had defects, dangers, and characteristics that were other than what Defendants had represented to Plaintiff, Plaintiff's physician(s) and the healthcare industry generally. Specifically, Defendants negligently or recklessly concealed from Plaintiff, Plaintiff's prescribing physicians, the health care industry, and the consuming public that:

a.      the defective, improper, negligent, fraudulent, and dangerous design of Zantac and ranitidine;

b.      that ranitidine had not been adequately tested prior to product launch;

c.      the connection between ranitidine and Zantac and NDMA formation;

d.      that ranitidine and Zantac can produce NDMA at harmful levels;

e.  that harmful levels of NDMA is carcinogenic;

f.  the inadequacy of the labeling for Zantac and ranitidine; and

g.  the dangerous effects of Zantac and ranitidine.

205.  These negligent or reckless misrepresentations and/or negligent or reckless failures to disclose were perpetuated directly and/or indirectly by Defendants.

206.  Defendants should have known through the exercise of due care that these representations were false, and they made the representations without the exercise of due care leading to the deception of Plaintiff, Plaintiff's prescribing physicians, and the healthcare industry.

207.  Defendants made these false representations without the exercise of due care knowing that it was reasonable and foreseeable that Plaintiff, Plaintiff's prescribing physicians, and the healthcare industry would rely on them, leading to the use of ranitidine by Plaintiff, as well as the general public.

208.  At all times herein mentioned, neither Plaintiff nor Plaintiff's physicians were aware of the falsity or incompleteness of the statements being made by Defendants and believed them to be true. Had they been aware of said facts, Plaintiff's physicians would not have prescribed and Plaintiff would not have taken ranitidine.

209.  Plaintiff justifiably relied on and/or was induced by Defendants' negligent or reckless misrepresentations and/or negligent or reckless failure to disclose the dangers of Zantac and ranitidine and relied on the absence of information regarding the dangers of Zantac and ranitidine which Defendants negligently or recklessly suppressed, concealed, or failed to disclose to Plaintiff's detriment.

210.    Defendants had a post-sale duty to warn Plaintiff, Plaintiff's prescribing physicians, and the general public about the potential risks and complications associated with Zantac and ranitidine in a timely manner.

211.    Defendants made the representations and actively concealed information about the defects and dangers of Zantac and ranitidine with the absence of due care such that Plaintiff's prescribing physicians and the consuming public would rely on such information, or the absence of information, in selecting ranitidine as a treatment.

212.    As a direct and proximate result of Defendants' concealments and omissions, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

213.    As a proximate result of the Defendants' concealments and omissions, as alleged herein, there is and was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

214.    As a proximate result of Defendants' concealments and omissions, as alleged herein, Plaintiff sustained a loss of income and/or loss of earning capacity.

215.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

216.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

217.    WHEREFORE, Plaintiff requests the Court to enter judgment in Plaintiff's favor and against the Defendants for:

a.  For general (non-economic) and special (economic) damages in a sum in excess of the jurisdictional minimum of this Court;

b.  For medical, incidental, and hospital expenses according to proof;

c.  For pre-judgment and post-judgment interest as provided by law;

d.  For full refund of all purchase costs Plaintiff paid for ranitidine;

e.  For compensatory damages in excess of the jurisdictional minimum of this Court;

f.  For consequential damages in excess of the jurisdictional minimum of this Court;

g.  For expenses and costs of this action; and

h.  For such further relief as this Court deems necessary, just, and proper.

DATED this 6th day of March, 2020.

*/s/ Courtney L. Mohammadi*

**Courtney L. Mohammadi**
Florida Bar No. 91414
Email:  efile@pmkm.com
**Michael L. McGlamry** (*pro hac forthcoming*)
Georgia Bar No. 492515
Email:  efile@pmkm.com
**N. Kirkland Pope**
Georgia Bar No. 584255
Email:  efile@pmkm.com
**Caroline G. McGlamry** (*pro hac forthcoming*)
Georgia State Bar No. 230832
Email:  efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road, N.E. Suite 300
Atlanta, Georgia  30326
404-523-7706 (phone)
404-524-1648 (fax)

*ATTORNEYS FOR PLAINTIFF*